ADAMS, Justice.
The Alabama State Highway Department and Perry A. Hand, its director,[1] appeal from an order of the trial court implementing one aspect of a comprehensive settlement agreement among the parties in this case which established guidelines for the maintenance of Little Lagoon in Gulf Shores, Alabama. We affirm.
This case comes before this Court with an interesting factual and procedural history:
The State Highway Department (“Department”) installed concrete jetties at the junction of Little Lagoon (an interior body of water) and the Gulf of Mexico in the early 1980’s, to stabilize a bridge embankment and to guarantee a flow of water between Little Lagoon and the Gulf of Mexico close to Alabama Highway 182. Before the installation of the jetties, the Department would open the pass to allow a flow of water whenever the natural cut between Little Lagoon and the Gulf of Mexico was clogged or the bridge embankment was threatened.
The jetties were originally constructed approximately 275 feet south of Highway 182, but they were later extended by approximately 200 feet. The Corps of Engineers granted a permit to the Department for the extension of the jetties, upon the condition that the Department would continue to monitor the jetties in an effort to prevent further shoreline erosion problems. The installation of the jetties, however, interrupted the natural flow of the sand between the beaches located on the East and West sides of Little Lagoon. As a result of this interruption, the beach on the eastern side of Little Lagoon widened because of the increase in the sand level and the beach on the western side of Little Lagoon suffered from “beach starvation,” which was caused by the diminishing sand level on that portion of the beach.
In January 1991, the level of sand lost on the beach on the western side of Little Lagoon was so extreme that the City of Gulf Shores condemned a dozen houses located on *287 that side of Little Lagoon because of their increasing closeness to the Gulf of Mexico. On February 6, 1991, Ronald E. Parsons and Joan L. Parsons sued the Department and Perry A. Hand, as the director of the Department, on behalf of themselves and the class of persons owning real property west of Little Lagoon Pass, alleging that “the actions of the Highway Department in connection with [the] jetties ... constituted- an unlawful and unconstitutional taking of private property without condemnation proceedings and without just compensation.” The Parsonses, on behalf of themselves and as class representatives, sought damages and injunctive relief requiring the Department to take the necessary steps to prevent the erosion caused by the jetties. The complaint was subsequently amended to allege additional causes of action based on trespass and nuisance.
The Department filed alternative motions to dismiss or for a change of venue. On April 26, 1991, the Parsonses moved for a preliminary injunction and requested an expedited hearing because of the increasing severity of the erosion problem caused by the jetties and because of the possibility that houses would collapse into the Gulf of Mexico.
On June 4, 1991, the Civil Litigation Division of the Office of the Attorney General moved to intervene and filed a complaint of intervention, on behalf of the people of the State of Alabama. The Civil Litigation Division sought to protect the pecuniary interest of the state and the public’s right of access to the state’s beachfront, west of Little Lagoon Pass.
On June 5, 1991, after a hearing, the trial court granted the Department’s motion to dismiss the Parsonses’ complaint, except for the claims based on inverse condemnation and nuisance. The parties thereafter entered into a comprehensive settlement agreement, which provided for two phases of work to be performed by the Department. Phase I of the agreement provided for emergency beach nourishment to save the houses, and Phase II prescribed a long-term remedy to stop the erosion. The agreement also delegated the duty of determining the specifics of a long-term solution to the erosion problem to a task force composed of representatives chosen by the parties. The agreement further provided that the first part of the court’s order would be reviewed two years after its implementation, and that, if it was found to be unsuccessful, the court would then order and devise another plan to stop the erosion problem resulting from the jetties.
On June 25, 1991, the court entered an order confirming the settlement agreement and ordering the parties to comply with the provisions of the settlement agreement. On August 26, 1991, the court conducted an ore terms hearing, during which it received testimony concerning the best solution for resolving the erosion problem. The court thereafter entered an “Order Regarding Phase II, Plan A Remedy” on October 31, 1991.
The order enjoined the following:
“ ‘(1) the continued existence of those portions of the jetties at Lagoon Pass in Gulf Shores, Alabama, which lie south of the pedestrian walkover except for that portion reasonably calculated by [Department] engineers to be necessary to maintain the structural integrity of the walkover, if any. Effective upon the date of this Order, Defendants are hereby ORDERED and DIRECTED to immediately apply for all necessary permits for the destruction of said portion of the subject jetties, and upon receipt of such necessary permits, Defendants are hereby ORDERED and DIRECTED to destroy and permanently remove all portions of the subject jetties enjoined above. In the event the necessary permits have not been issued to the Defendants on or before February 1, 1992 the Defendants shall be ORDERED and directed to comply with the directives of Paragraphs 3, 4 and 5 of this Order, but shall no longer be under an order of this court to completely destroy and remove the existing jetties. In such event, nothing in this order shall be deemed to prevent Defendants or the Plaintiff Class from pursuing further efforts toward removal of the jetties.’ ”
*288 The order required the following:
“(2) maintenance of the channel performance of the pass on a monthly basis by the [Department];
“(3) [that] in the event the necessary permits were not issued:
“(a) the [Department will] be required to remove 100 feet of the east jetty and reduce the west jetty to a point equal to the east jetty by March 1, 1992;
“(b) by April 1, 1992, [the Department will be required to] place additional sand necessary to maintain the beach at a width of 325 feet;
“(c) a four year monitoring program [will] be conducted by the University of South Alabama to document the performance of both Phase I and Phase II-A, beach stabilization plans and the ensuring impact on Little Lagoon water quality and egress/ingress.... ”
Finally, the order stated that the court would retain jurisdiction.
The October 31, 1991, order was made final pursuant to Rule 54(b), Ala.R.Civ.P. The court denied all post-judgment motions, and on February 25, 1992, it amended the October 31, 1991, order to put into effect certain provisions of the plans if the Corps of Engineers did not grant the necessary permits by April 1,1992. On December 4,1991, the Little Lagoon Preservation Society and Talty O’Connor (“LLPS”) sought leave to intervene prospectively as representative members of a class of persons owning property at Little Lagoon Park. On February 7, 1992, the LLPS filed a motion requesting specific physical guidelines for maintenance of Little Lagoon Pass following the anticipated shortening and/or removal of the jetties.
On May 22,1992, Richard C. Luce, individually and as representative of a class of persons owning property near Little Lagoon, moved to intervene, seeking to preserve the water quality in Little Lagoon by preventing the removal of the jetties. After a hearing on the LLPS’s motion, the trial court entered an order on July 10, 1992, entitled “Order Establishing Parameters for Maintenance of the Little Lagoon Pass as Ordered October 31,1991 in Decree Regarding Phase II Plan-A Remedy,” based on testimony presented by the Parsonses, the Department, and the LLPS. The July 10 order provided the specific standard for complying with the court’s October 31, 1991, order. The Department thereafter filed a motion to alter, amend, or vacate that July 10 order; the court denied that motion, and the Department and Hand appealed on July 24, 1992.
I.
The first argument presented by the Department is that the July 10, 1992, order conflicts with the regulatory authority of the United States Corps of Engineers under the Rivers and Harbors Act, 33 U.S.C. § 403, and, therefore, violates Article VI of the United States Constitution and its preemptive provisions. We disagree.
Generally, if it is Congress’s intent to occupy a given field, then any state law within that field is preempted:
“Congress may preempt state authority to act by using explicit preemptive language in a statute. Fidelity Federal Savings & Loan Ass’n v. De La Cuesta, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). Absent explicit preemptive language, Congress’ intent to supersede state law altogether may be inferred because: (1) the scheme of the federal law is so pervasive that the reasonable inference is that Congress left no room for the states to supplement it; (2) the field in which the federal law touches is one where the federal interest is so dominant that it will be assumed to preclude the enforcement of state laws on the same subject; or (3) the object that is sought to be obtained by the federal law and the character of the obligations imposed by it reveal a strong federal purpose. Pacific [Gas and Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, at 203, 103 S.Ct. 1713 at 1722, 75 L.Ed.2d 752 (1983)]; Fidelity, [458 U.S. at 153,] 102 S.Ct. at 3022.
“Second, where ‘Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and *289 federal law, ... or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.’ Silkwood [v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)], (citations omitted).”
Tectonics, Inc. of Florida v. Castle Constr. Co., 753 F.2d 957, 961 (11th Cir.1985).
The Rivers and Harbors Act, 33 U.S.C. § 403, provides as follows:
“Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in
“The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers, and authorized by the Secretary of the Army prior to beginning the same.”
The purpose of § 403 is to prohibit obstructions in navigable waters and to protect navigation. Potomac River Ass’n, Inc. v. Lundeberg Maryland Steamship School, Inc., 402 F.Supp. 344 (D.Md.1975). Furthermore, “this chapter, regulating navigable waters and prohibiting obstruction thereof, is manifestly intended for protection of private parties even though the enforcement of the provisions is vested in the United States.” Lauritzen v. Chesapeake Bay Bridge & Tunnel Dist., 259 F.Supp. 633 (E.D.Va.1966).
The essence of the Department’s argument is that the order encroaches on the regulatory authority of the Corps of Engineers under the Rivers and Harbors Act. The purpose of the order was to set specific “standards and/or parameters for maintenance of the Pass pursuant to the Court’s express finding of October 31, 1991, that the environmental interest of the Little Lagoon and the interest of the Lagoon property owners required the Pass to be kept open.” The pertinent provision of the order reads as follows:
“1. Upon obtaining necessary maintenance dredging permits from the United States Army Corps of Engineers for the maintenance of Little Lagoon Pass in accordance with and conditioned upon the parameters set forth in paragraph 1 through 5(f) in this Order, the Alabama Highway Department shall be relieved of the stay order regarding removal of the jetties as entered by this Court on 4/9/92 and as modified and extended on 5/11/92, and shall remove those portions of the jetties for which a permit for modification has previously been issued by the Corps of Engineers. The Alabama Highway Department is ordered to immediately take all appropriate and necessary steps to obtain from the Corps of Engineers a permit to allow dredging of the Little Lagoon pass in accordance with this Order.”
(Emphasis original.)
At issue is an equitable order that the trial court issued after an extensive ore tenus hearing. A plain reading of this order suggests that the trial court was cognizant of its inability to enforce the requirements of the order on the Department, prior to the Department’s acquiring the necessary permits from the Corps of Engineers. The Department, in compliance with the October 31, 1991, order, initiated proceedings to acquire the necessary permits from the Corps of Engineers; therefore, its argument regarding the court’s intrusion upon the regulatory authority of the Corps of Engineers is patently inconsistent. Furthermore, the order does not intrude upon the regulatory authority of the Corps of Engineers under the Rivers and Harbors Act, but, rather, properly defers to its jurisdiction under that Act and, *290 therefore, the order is not unconstitutional. And, finally, the Department did obtain permits from the Corps of Engineers.
II.
The Department’s next argument is that the July 10, 1992, order violates the Constitution of Alabama 1901 by granting private property owners improvements financed by state tax dollars. Although the Department phrases its argument so as to state that contention, the underlying thrust of its argument is an attempt to avoid its obligations under the settlement agreement entered into between it and the other parties on June 5,1991, and the court’s orders based on that agreement.
“A party cannot be heard to complain of action of the court which was done with the party’s consent.” Sayre v. Dickerson, 278 Ala. 477, 179 So.2d 57, 63 (1965). “This Court has repeatedly held that agreements made in settlement of litigation are as binding on the parties thereto as any other con-tract_ Such agreements ... will not be set aside except for fraud, collusion, accident, surprise or some ground of this nature.” Brocato v. Brocato, 332 So.2d 722 (Ala.1976) (citing Ex parte Hayes, 92 Ala. 120, 9 So. 156 (1891)).
On June 5,1991, the parties entered into a comprehensive settlement agreement. The pertinent provisions of the agreement provided for emergency beach nourishment to save the houses and a long-term remedy to stop the erosion problem. The court entered an order confirming the settlement agreement and amending the remedial provision of the agreement. The trial court stated, in pertinent part:
“While the settlement agreement could have language to place one party or another in a stronger position, the court is reasonably satisfied that the Settlement Agreement presented by the parties and amended by the court to clarify one portion of the agreement is fair and reasonable to all parties concerned.... ”
We have carefully examined the agreement in this case, and the relationship of the parties thereto, and we cannot conclude that the agreement was the result of iraud, collusion, accident, or surprise, or that there is any related ground for setting it aside. It appears that the agreement entered into between the parties is fair and reasonable as to all parties affected by its terms; the Department is bound by its obligations under that agreement.
III.
The Department’s last argument is that the court erroneously allowed the LLPS to intervene in this action. We disagree.
Rule 24(b) A.R.Civ.P., provides:
“Permissive intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute confers a conditional right to intervene; or (2) when an applicant’s claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.”
Generally, the ruling on a motion to intervene is within the discretion of the trial court and will not be disturbed on appeal unless there is an abuse of discretion. Root v. City of Mobile, 592 So.2d 1051 (Ala.1992); Dearmon v. Dearmon, 492 So.2d 1004 (Ala.1986). See also McKleroy v. Wilson, 581 So.2d 796 (Ala.1990). An intervenor must have a direct, substantial, and legally protectable interest in the proceeding. Duncan v. First Nat’l Bank of Jasper, 573 So.2d 270 (Ala.1990).
The LLPS sought leave to intervene on December 4, 1991, on the following grounds:
“1) the maintenance of the jetties by the [Department] has directly affected the property owned by the members of the LLPS;
*291 “2) the maintenance of the jetties by the [Department] has impaired the ability of the Little Lagoon to flush and remain a viable salt water body;
“3) a claim for damages will accrue in favor of the LLPS based upon inverse condemnation, if the jetties are altered and the Pass is closed; and
“4) the matter cannot be justly and completely adjudicated without the intervention of the LLPS, and the LLPS has no other legal remedy.”
The court, after an ore tenus hearing, allowed the LLPS to intervene, stating, “Talty O’Connor and Little Lagoon Preservation Society are granted leave to intervene in this action, prospectively, and the effective date of such intervention is deemed to be January 28, 1992.”
We have considered the record in this case, including, particularly, the motion to intervene and the motions filed in opposition thereto. We also realize that the LLPS was allowed to intervene in this action after the trial court had entered the October 31, 1991, order; however, we note:
“Regardless of whether the appellants claim a sufficient interest, Rule 24 requires that any motion to intervene be ‘timely.’ It has long been held that the determination of timeliness is a matter committed to the sound discretion of the trial court. Randolph County [v. Thompson, 502 So.2d 357, 364 (Ala.1987)]. See Strousse v. Strousse, 56 Ala.App. 436, 322 So.2d 726 (1975). See also McDonald v. E.J. Lavino Co., 430 F.2d 1065, 1072 (5th Cir.1970).”
Duncan v. First National Bank of Jasper, 573 So.2d 270, 274-75 (Ala.1990). We, therefore, hold that the trial court did not abuse its discretion in allowing the LLPS to intervene in this action.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
HORNSBY, C.J., and ALMON, SHORES and STEAGALL, JJ., concur.

. We note that Perry Hand has been succeeded as director by G. Mack Roberts. See Rule 43(b), Ala.R.App.P.